UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ATAIN SPECIALTY INSURANCE COMPANY,<br><br>            Plaintiff,<br><br>    v.<br><br>RICHARD SZETELA d/b/a D&D PILOT CAR SERVICES, et al.,<br><br>            Defendants. | No. 2:14-cv-02991-KJM-KJN<br><br>ORDER |

        This case concerns a narrow question of California insurance law: are pilot car services "professional services"? The matter is before the court on the parties' cross motions for summary judgment, which were submitted for decision without a hearing. As explained below, the motion brought by plaintiff Atain Specialty Insurance Company is granted, and the motion brought by defendant Alterra Insurance Company is denied. Atain's additional motion for default judgment is denied without prejudice.

I.     UNDISPUTED FACTS AND PROCEDURAL HISTORY

        Defendant Richard Szetela operated a pilot car service for oversized loads, doing business under the name D&D Pilot Car Services. Joint Stip. Facts (Stip.) ¶ 1, ECF No. 29. A pilot car acts essentially as an escort for a larger vehicle, checking the road ahead for danger. *See*

1

Cal. Veh. Code § 472. Szetela was certified as a pilot-car operator. Alterra Resp. Stmt. Undisp. Mat. Facts (UMF1) no. 2, ECF No. 37-1. This certification required him to complete a day-long course, review written materials and regulations from several states, and pass a certification exam. *Id.* He also independently reviewed other materials on the internet. *See id.* no. 5.

In April 2012, D&D agreed to provide pilot car services for Duffy Crane & Hauling while Duffy transported a large piece of machinery, a "compression filter skid,"[1] from Colorado to California. Atain Resp. Stmt. Undisp. Mat. Facts (UMF2) no. 1, ECF No. 36-1. Transportation of the skid required a permit from each state, including California, which Duffy obtained. *Id.* nos. 3–4. The California permit allowed the skid to be transported only along a specific route, so before entering California, Duffy gave Szetela a copy of the permit, and Szetela entered the route specified into Microsoft Streets, which provided him detailed directions. *See id.* no. 7.[2]

Szetela then guided Duffy's truck, skid in tow, into California using the directions he obtained. *See id.* nos. 7–8. Attached to the pilot car was a pole approximately the same height as the skid. *See id.* no. 8. While Szetela drove the pilot car along U.S. Route 395 in Mono County, the pole struck an overpass. *Id.* Szetela radioed back to Duffy's driver to stop, but the driver didn't stop. *Id.* no. 9. The skid struck the overpass and was damaged. *Id.*

Alterra Insurance Company, Duffy's insurer, sued Szetela, D&D, and other defendants in Sacramento County Superior Court. *Id.* no. 10; Stip. Exs. B, C. In this order the court refers to this state-court case as the "underlying action." In the underlying action Alterra alleges it made payments related to the damaged skid on Duffy's behalf. *See* Stip. Ex. B. It asserts two claims against Szetela and D&D: breach of contract and negligence. *See id.* Duffy intervened in the underlying action and asserts the same two claims. *See* Stip. Ex. C.

---

[1] According to Duffy's insurer, a compression filter skid is "an industrial gas processing unit" comprised of "three vertical metal cylindrical tanks or reservoirs and attached machinery." Alterra Mem. Summ. J. 3 n.3, ECF No. 25.

[2] On the record here it is unclear whether the route Szetela received was the route Duffy requested or the route California approved, but the issue is not material.

2

1  According to the pleadings in the underlying action, D&D entered a written agreement to indemnify Duffy for damages to the skid.  *See generally* Stip. ¶ 7 & Exs. B–D.  This agreement forms the basis of Alterra's claims for contract damages in the underlying action.  *See* Stip. Ex. B, ¶ 28.  Alterra's negligence claims are based on its allegation that D&D and Szetela had a duty to exercise reasonable care as contractors to avoid reasonably foreseeable injuries to Duffy.  *See id.* ¶ 31.  It alleges the pilot car services were performed "in an unworkmanlike manner."  *Id.* ¶ 32.

Atain Specialty Insurance Company issued a commercial general liability (CGL) insurance policy to D&D, under which it is paying a portion of D&D's defense fees and costs in the underlying action under a reservation of rights.  *See* Stip. ¶ 2.  For ease of reference, the court refers to the policy issued by Atain to D&D as the D&D policy.

Atain filed a complaint in this court in December 2014, alleging it owes no duty to defend or indemnify D&D for the claims asserted in the underlying action, naming Szetela, Alterra, and Duffy as defendants.  *See generally* Compl., ECF No. 1.  In short, Atain alleges that Alterra's claims in the underlying action are withdrawn from coverage by two exclusions in the D&D policy.  Alterra filed an answer and counterclaim in February 2015.  *See* Answer & Countercl., ECF No. 12.  Alterra requests declaratory relief that its claims in the underlying action are not within the exclusions Atain cites.  Szetela did not answer Atain's complaint, and a clerk's entry of default was filed as to Szetela on May 5, 2015.  ECF No. 18.

Both Atain and Alterra moved for summary judgment on December 14, 2015.  Alterra Mot. Summ. J., ECF No. 24; Alterra Mem. Summ. J., ECF No. 25; Atain Mot. Summ. J., ECF No. 31.  Both motions were opposed, Opp'n Alterra Mot., ECF No. 36; Opp'n Atain Mot., ECF No. 37, and both parties replied, Atain Reply, ECF No. 40; Alterra Reply, ECF No. 42.  Atain's reply brief exceeds the page limits imposed by this court's standing order, and it did not apply for an extension of those limits.  *See* Standing Order 4, ECF No. 5-1.  Atain's reply brief is therefore stricken.

/////

/////

3

II.   LEGAL STANDARDS

Both Alterra and Atain move for summary judgment under Federal Rule of Civil Procedure 56. Under that rule, the court must enter judgment as a matter of law if "no genuine dispute as to any material fact" requires a trial. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Cross motions for summary judgment, such as those at hand, are evaluated separately under the same standard. *Am. Civil Liberties Union of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003). Here, the parties dispute no material fact; all that remains is a determination of who is entitled to judgment.

In this diversity action, the court applies California law to interpret the policy. *Bell Lavalin, Inc. v. Simcoe & Erie Gen. Ins. Co.*, 61 F.3d 742, 745 (9th Cir. 1995). "Interpretation of an insurance policy is a question of law and follows the general rules of contract interpretation." *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 647 (2003). Contract interpretation seeks out the parties' "mutual intention" at the time the contract was formed. *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995) (citing Cal. Civ. Code § 1636). If possible, the parties' intent is inferred solely from the policy's written terms, read as a whole. *Id.* (citing Cal. Civ. Code § 1639). The policy's words are therefore the place to start. *Id.* Unless the parties intended to use words in a technical or special sense, a court reads a policy's language to understand its plain meaning as a layperson ordinarily would. *Id.* (citing Cal. Civ. Code §§ 1638, 1644). And the court has no power to insert language one party wishes were there or to delete a provision another would like to avoid. *ML Direct, Inc. v. TIG Specialty Ins. Co.*, 79 Cal. App. 4th 137, 142 (2000).

III.   DISCUSSION

The terms at issue in this case are part of the policy's CGL coverage provisions. *See* Stip. Ex. A, at 11;[3] UMF2 no. 15. "[A] CGL policy, often referred to as a business general liability policy, provides liability insurance for businesses." *Waller*, 11 Cal. 4th at 16. The scope of a CGL policy is generally limited to "accidental occurrences" rather than claims of

---

[3] To avoid confusion, pin citations in this document refer to page numbers printed by the CM/ECF system at the top right corner of each page.

professional negligence. *Tradewinds Escrow, Inc. v. Truck Ins. Exch.*, 97 Cal. App. 4th 704, 713 (2002). Ordinarily a CGL policy is written in two parts: first, the insuring agreement, which defines the risks the policy covers, and second, exclusion clauses, which remove coverage for certain risks that otherwise would fall within the insuring agreement's scope. *Waller*, 11 Cal. 4th at 16.

The party asserting coverage bears the burden to establish a claim is within the insuring agreement's basic scope. *MacKinnon*, 31 Cal. 4th at 648. But "[w]hen it comes to exclusions, the insurer bears the burden of proving the exclusion applies." *ML Direct*, 79 Cal. App. 4th at 141. This rule reflects California's policy "to afford the greatest possible protection to the insured" in an environment where "the insurer draftsman controls the language of the policy." *White v. W. Title Ins. Co.*, 40 Cal. 3d 870, 881 (1985); *accord Hollingsworth v. Commercial Union Ins. Co.*, 208 Cal. App. 3d 800, 805 (1989). Exclusionary clauses are therefore interpreted narrowly and against the insurer. *MacKinnon*, 31 Cal. 4th at 648.

Here, implicit in the parties' briefing is their agreement that the claims in the underlying action are within the policy's insuring agreement. Their cross motions concern rather two of the policy's exclusions. The first is the policy's professional services exclusion, and the second is its contractual liability exclusion. The professional services exclusion provides as follows:

> This insurance does not apply to:
>
> "Bodily injury", "property damage" or "personal and advertising injury" including payment for loss or defense costs in connection with any claim made against any insured based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the rendering or failure to render any professional service by, but not limited to, any Accountant, Architect, Engineer, Insurance Agent or Broker, Lawyer, Medical Professional or Real Estate Agent Broker, or any other service that is of a professional nature.

Stip. Ex. A, at 51. The policy does not define the phrases "professional service" and "of a professional nature."

Alterra agrees its claim against D&D in the underlying action is "arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the failure to

5

1   render pilot car services described in the Pilot Car Agreement between D&D and Duffy." Stip.
2   Ex. G, at 12. And although Alterra denies the skid hit the overpass while D&D was performing
3   pilot car services, it admits the collision occurred while D&D was "supposed to be performing
4   pilot car services." *Id.* The question is therefore quite narrow: was Szetela performing a
5   "professional service" when he provided pilot car services?

6        California courts long ago abandoned the antiquated notion of professional
7   services as those performed only by learned doctor, lawyer, or engineer. *Amex Assur. Co. v.*
8   *Allstate Ins. Co.*, 112 Cal. App. 4th 1246, 1251–52 (2003). Today a person's services are
9   evaluated "in light of all the relevant circumstances in which the claim arises," including "the
10  term's commonly understood meaning, the type and cost of the policy, and the nature of the
11  enterprise." *Hollingsworth*, 208 Cal. App. 3d at 806.

12       The most thorough treatment of "professional services" in this context is the
13  California Court of Appeal's decision in *Hollingsworth v. Commercial Union Insurance*
14  *Company, supra*. In *Hollingsworth*, the court considered whether "ear-piercing services"
15  provided by the insured beauty parlor were "professional services." First, the court held that the
16  commonly understood meaning of "professional" services is the antonym of "amateur," as in
17  "professional hairdresser," "professional informer," and "professional fundraiser."[4] 208 Cal.
18  App. 3d at 806–07. In other words, a professional service is "an activity done for remuneration as
19  distinguished from a mere pastime."[5] *Id.* Second, as for the "type and cost of the policy," the
20  *Hollingsworth* court reviewed the policy's premium, name, coverage, and other exclusions and

---

[4] In a 2002 decision, the California Court of Appeal read *Hollingsworth* to define professional services differently, as "those 'arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual.'" *Tradewinds*, 97 Cal. App. 4th at 713 (quoting *Hollingsworth*, 208 Cal. App. 3d at 806). The quoted passage, however, came not from *Hollingsworth*'s holding, but from its summation of the insured's argument, an argument it declined to adopt. *See* 208 Cal. App. 3d at 806–07 ("[A]s commonly understood, the term 'professional services' is not as narrowly circumscribed as [the insured] proposes."). As the *Tradewinds* court offered this definition with no analysis, its authority on this point is doubtful.

[5] The *Hollingsworth* court also suggested "professional criminal," *see id.*, though it is hard to imagine a person undertaking crime as a "mere pastime."

6

1 found it was essentially "the business enterprise analog of a homeowner's policy" meant to
2 protect against accidents. *Id.* at 808. And third, as for "the nature of the enterprise," the
3 *Hollingsworth* court considered that the claimant was in the cosmetics business, "devoted to
4 grooming and the improvement of personal appearance." *Id.* at 808–09. Thus ear-piercing
5 services were professional services in a beauty parlor. *Id.* at 810. The court was untroubled by
6 the fact that one need not secure a license, undergo extensive training, or develop technical skill
7 to pierce ears. *Id.* at 809.

8 Under this definition, courts have found a wide range of activities are
9 "professional services," from chiropractic services, *Antles v. Aetna Cas. & Surety Co.*,
10 221 Cal. App. 2d 438, 443 (1963),[6] architectural and construction services, *Stone v. Hartford Cas.*
11 *Co.*, 470 F. Supp. 2d 1088, 1098 (C.D. Cal. 2006), and plumbing services, *Amex*, 112 Cal. App.
12 4th at 1252, to website operation services, *Tagged, Inc. v. Scottsdale Ins. Co.*, No. 11-0127, 2011
13 WL 2748682, at *6 (S.D.N.Y. May 27, 2011) (applying California law), agronomist consulting
14 services, *Britz Fertilizers, Inc. v. Nationwide Agribusiness Ins. Co.*, No. 10-02051, 2013 WL
15 5519605, at *47 (E.D. Cal. Oct. 3, 2013), and, as noted above, ear-piercing services,
16 *Hollingsworth*, 208 Cal. App. 3d at 810.

17 Here, the parties agree Szetela performed pilot car services in exchange for a price
18 and not as a pastime. It is also undisputed Szetela obtained certification as a pilot car operator,
19 and pilot car escort services are both regulated and subject to national guidelines. *See* UMF1
20 nos. 2, 3, 6. Furthermore, the insuring agreement here is part of the policy's CGL provisions.
21 CGL policies are generally understood to provide coverage for accidental occurrences, *see, e.g.*,
22 *Tradewinds*, 97 Cal. App. 4th at 712–13, whereas professional liability insurance policies are
23 understood to provide coverage for liability that "arise[s] out of the special risks inherent in the
24 practice of the profession," *PMI Mortg. Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, 394 F.3d
25 761, 766 (9th Cir. 2005); *Horizon W. Inc. v. St. Paul Fire And Marine Ins. Co.*, 214 F. Supp. 2d

---

[6] Although *Antles* was decided before *Hollingsworth*, courts have found the two cases to be consistent. *See, e.g.*, *Food Pro Int'l, Inc. v. Farmers Ins. Exch.*, 169 Cal. App. 4th 976, 990 (2008).

7

1074, 1078–7 (E.D. Cal.), *aff'd*, 45 F. App'x 752 (9th Cir. 2002).  Collision with an overpass is certainly within the realm of the "special risk inherent in the practice of" pilot car services.  In sum, "the type and cost of the policy, and the nature of the enterprise" here demonstrate pilot car services are "professional services" within the terms of the D&D policy.

This is true despite differences between the D&D policy's language and those at issue in *Hollingsworth* and similar cases.  Compare, for example, the professional services exception from *Hollingsworth*,

> [The policy] does not insure you for bodily injury or property damage due to the providing of, or failure to provide, any professional service.  However, this exclusion does not apply to pharmacological services if you are doing business as a retail drugstore,

208 Cal. App. 3d at 803, and the exception from *Amex*,

> We do not cover bodily injury or property damage arising out of the rendering of or failure to render professional services by an insured person,

112 Cal. App. 4th at 1251 (emphasis omitted), with the language of the professional services exception in the D&D policy:

> This insurance does not apply [to claims] . . . involving the rendering or failure to render any professional service by, but not limited to, any Accountant, Architect, Engineer, Insurance Agent or Broker, Lawyer, Medical Professional or Real Estate Agent Broker, or any other service that is of a professional nature,

Stip. Ex. A, at 51.  Whereas the policies in *Hollingsworth* and *Amex* list no examples to define "professional services," the D&D policy defines professional services as those rendered by an "Accountant, Architect, Engineer, Insurance Agent or Broker, Lawyer, Medical Professional or Real Estate Broker" plus "any other service that is of a professional nature."  Neither did the *Hollingsworth* and *Amex* policies refer to services rendered "by" specific persons, as does the D&D policy.

In both statutory and contract interpretation, when an ambiguous term of uncertain meaning is accompanied by other, more specific terms, the ambiguous, general term should be understood in line with the specific terms. *Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1045 n.4 (2008).  This rule is often invoked by its Latin name, *ejusdem generis*, and is an

8

application of a broader rule of construction, *noscitur a sociis*, *i.e.*, the meaning of one word may be discerned from those surrounding it.  For example, in *Circuit City Stores, Inc. v. Adams*, the U.S. Supreme Court interpreted the general phrase "any other class of workers engaged in commerce" alongside the specific words "seamen" and "railroad employees," and found that the general phrase referred only to "transportation workers," not all employees.  532 U.S. 105, 115, 119 (2001).  And in *Nygard v. Uusi-Kerttula*, the California Court of Appeal interpreted the general phrase "any information, knowledge or data of the Company" alongside the specific words "methods of doing business; trade and design secrets; financial data . . . ; suppliers and corporate contact names, addresses and telephone numbers; and records pertaining to employees . . . ," and found that the general phrase referred only to "proprietary information or trade secrets," not the company president's personal life.  159 Cal. App. 4th at 1045.  Under this rule, the D&D policy's general phrases—"professional service" and "any other service that is of a professional nature"—would refer to services within the "same general nature or class" as those performed by accountants, architects, doctors, lawyers, engineers, and brokers.

The doctrine of *ejusdem generis* is "by no means a rule of universal application." *Zumbrun Law Firm v. Cal. Legislature*, 165 Cal. App. 4th 1603, 1619 (2008) (citation and quotation marks omitted).  It is in fact rejected quite frequently.  *See, e.g.*, *Admiral Ins. Co. v. Kay Auto. Distributors, Inc.*, 82 F. Supp. 3d 1175, 1179 (C.D. Cal. 2015); *Moore v. Cal. State Bd. of Accountancy*, 2 Cal. 4th 999, 1013 (1992); *Pfeifer v. Countrywide Home Loans, Inc.*, 211 Cal. App. 4th 1250, 1277 (2012); *In re Tobacco Cases I*, 186 Cal. App. 4th 42, 48 (2010); *Zumbrun*, 165 Cal. App. 4th at 1619–20.  A litigant may not use the rule to circumvent the contracting parties' intent as apparent from the contract as a whole.  *See Zumbrun*, 165 Cal. App. 4th at 1619; *Pfeifer*, 211 Cal. App. 4th at 1277; *see also Nygard*, 159 Cal. App. 4th at 1045 n.4 (general words should not be limited by specific words when "a contrary intent is manifested" (quotation marks and citation omitted)).

Here, the court cannot agree that "professional services" excludes pilot car services, as this construction would defeat the parties' intent, as apparent from the D&D policy as a whole.  As described above, the policy is not a professional liability insurance policy, but a

9

CGL policy, and it is apparent from its general form as a CGL policy, from the language of the insuring agreement, and from its exclusions, which fit those traditionally found in a CGL policy, that the policy was not intended to provide coverage for D&D's negligence when performing pilot car services. In addition, Alterra's and Duffy's claims in the underlying action charge D&D with failures to perform services in a "professional" setting, as that word is understood under California insurance law. To interpret the policy as Alterra suggests would render the professional services exclusion meaningless; it is hard to imagine how a claim against D&D could arise from some third-party lawyer's, doctor's, or accountant's professional negligence.

Alterra has also assumed without explanation that pilot car services fall outside the general class defined by "Accountant, Architect, Engineer, Insurance Agent or Broker, Lawyer, Medical Professional or Real Estate Agent Broker, or any other service that is of a professional nature." But safe and dependable navigation on unfamiliar roads is not so banal and perfunctory a task as Alterra suggests. As noted above, a pilot car driver is certified, *see* UMF1 no. 2, and pilot car escort services are the subject of guidelines published by the U.S. Department of Transportation Federal Highway Administration, the Specialized Carriers and Rigging Association, and the Commercial Vehicle Safety Alliance. *See* UMF1 no. 6. Like traditional professionals, pilot car drivers are entrusted with their clients' safety and financial interests. Like traditional professionals, should a pilot car driver perform his services negligently, he subjects his clients to specific and obvious risks, including the risk of a client's cargo colliding with a highway overpass.

Finally, the court disagrees that this interpretation reads the preposition "by" out of the policy, as in "by, but not limited to, any Accountant . . . ." *See* Alterra Reply 2–3, ECF No. 42. The unambiguous purpose of the phrase is to provide examples of excluded professional services, and pilot car services fall within the policy's definition of "professional services." In any event, the preposition "by" cannot modify the catch-all phrase "any other service that is of a professional nature." Otherwise the policy would address the rendering of "any professional services . . . by any other service . . . "—hardly a sensible construction. Rather, the policy excludes coverage for liability related to the rendering of (1) "any professional services by,

10

including but not limited to, any Accountant . . ." and (2) "any other service that is of a professional nature."

To summarize, pilot car services are "professional services" within the meaning of the D&D policy's professional services exclusion. As the parties agree that Alterra's claims in the underlying action arise out of or relate to D&D's provision of pilot car services, the professional services exclusion withdraws the claims in the underlying action from coverage. Atain's motion for summary judgment is therefore granted, and Alterra's motion is denied. The court need not reach the parties' arguments about the contractual liability exclusion.

IV.     DEFAULT JUDGMENT

In addition to its motion for summary judgment, Atain applies for default judgment against Szetela. Entry of default judgment is governed by Federal Rule of Civil Procedure 55(b). Where, as here, a plaintiffs' claim is not for a sum certain, it must apply to the court for default judgment. Fed. R. Civ. P. 55(b)(2).

A plaintiff's application for default judgment is not granted automatically upon filing. *See Eitel v. McCool*, 782 F.2d 1470, 1471 (9th Cir. 1986). Rather, a district court has discretion in the entry of default judgment, and that discretion is guided by seven factors:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Id.* at 1471–72. In addition, under the Local Rules of this district, motions for default judgment are referred to the assigned magistrate judge. *See* E.D. Cal. L.R. 302(c)(19).

Other than possibly the merits of its claims, Atain's motion addresses none of the factors listed by the *Eitel* court. The motion is therefore denied without prejudice to renewal before the assigned magistrate judge.

/////

/////

/////

11

V.     CONCLUSION

      Atain's reply brief is STRICKEN.  Alterra's motion for summary judgment is DENIED.  Atain's motion for summary judgment is GRANTED.  Atain's motion for default judgment is DENIED without prejudice.

      This order resolves ECF Nos. 24 and 31.

      IT IS SO ORDERED.

DATED:  March 23, 2016.

                                UNITED STATES DISTRICT JUDGE